**UNITED STATES of America,**

v.

**Mario BIAGGI, Stanley Simon, Peter Neglia, John Mariotta, Bernard Ehrlich, Richard Biaggi, and Ronald Betso, Defendants.**

**No. 87 Cr. 265(CBM).**

United States District Court, S.D. New York.

June 17, 1993.

U.S. Atty. by Michael Gertzman, Asst. U.S. Atty., New York City, for U.S.

Mario Biaggi, Jr., New York City, for petitioner Mario Biaggi.

Dominic F. Amarosa, New York City, for petitioners Richard Biaggi and Stanley Simon.

## OPINION

MOTLEY, District Judge.

Mario Biaggi has moved, pursuant to Fed. R.Crim.P. 33, for a new trial on the basis of newly discovered evidence, namely, the discovery that one of the Government's witness-

es, Anthony Guariglia, committed perjury at Biaggi's trial.[1] The perjury relates to Guariglia's declaration that he had stopped gambling but in reality had not and to Guariglia's skimming of cash from a company called A & H Toys.[2] Co-defendants Richard Biaggi, Mario Biaggi's son, and Stanley Simon have also moved under Rule 33 for a new trial. Mario Biaggi has also requested an evidentiary hearing into the extent of Guariglia's perjury at trial. The Government has answered all motions. Mario Biaggi has submitted a Reply, but the other defendants have not submitted a reply to the merits of the Government's Answers.

### I. Mario Biaggi [3]

Mario Biaggi was convicted after a five month jury trial of participating and conspiring to participate in the affairs of Wedtech through a pattern of racketeering in violation of 18 U.S.C. § 1962(c) and (d) (Counts One and Two); extortion, bribery, and receipt of an unlawful gratuity in violation of 18 U.S.C. §§ 1951, 201(c) and (g) in connection with his demand and receipt of five percent of Wedtech's stock (Counts Three, Four, and Five); mail fraud in violation of 18 U.S.C. § 1341 in connection with his participation in a scheme to defraud the Department of Defense by concealing John Mariotta's ownership of less than 50% of Wedtech (Count Six); extortion, bribery, and mail fraud in violation of 18 U.S.C. §§ 1951, 201(c), and 1341 in connection with his demand for $50,000 in exchange for influencing public officials to grant Wedtech the One Loop Drive lease (Counts Ten, Eleven, and Twelve); false statements in violation of 18 U.S.C. § 1001, the Ethics in Government Act–Financial Disclosure Statements in concealing his ownership of Wedtech stock (Counts Seven, Eight, and Nine); filing false income tax returns in violation of 26 U.S.C. § 7206(i) for failing to report income derived from acquisition of Wedtech stock (Counts Fourteen and Fifteen); and perjury in violation of 18 U.S.C. § 1623 in connection with falsely testifying before a grand jury (Count Eighteen).

While the Court of Appeals affirmed each conviction, in June, 1991, this court reduced Biaggi's[4] sentence to time served on the basis of his medical condition.

The instant motion relies on Biaggi's argument that "Guariglia committed perjury at the Biaggi trial when he testified about his post cooperation activities and involvement with A & H Toys and Hobbies Inc." (Mario Biaggi's Motion for a New Trial, 2).

The core of petitioner Biaggi's rather convoluted motion is the claim that Guariglia's perjury in reference to his post-cooperation gambling and his alleged perjury in reference to his skimming of cash from A & H Toys somehow necessitates a new trial. "The newly discovered evidence consisting of skimming cash from A & H is the basis for this new trial motion.... By denying post cooperation criminal activity he was committing the crime of perjury to conceal his crime of tax evasion." (Biaggi's Motion for a New Trial at 3, 5). Biaggi argues that the Government should have known of Guariglia's perjury and therefore that a new trial should be granted. Richard Biaggi and Stanley Simon piggyback on Biaggi's work and in all

---

1. Mario Biaggi also moves for a vacation of his conviction pursuant to 28 U.S.C. § 2255. However, as the Government points out, since Biaggi is not in custody this motion is inappropriate. Biaggi apparently agrees, as he has not, in his Reply, addressed this argument. At oral argument of these motions there was no mention by movants of 28 U.S.C. § 2255.

2. The Government challenges the assertion that Guariglia's testimony about A & H Toys is perjurious. As will become apparent, however, one can assume that it was in order to decide this motion and still decide against movants.

3. The background that follows, and that for Richard Biaggi and Stanley Simon, is taken largely from the papers of the Government, as are the

citations to the trial transcript and to the exhibits introduced at trial. Petitioners have not contested the accuracy of the facts presented by and the evidence referred to by the Government; instead, they merely claim the new evidence of perjury mandates a new trial regardless of what other witnesses testified to at trial and what the documentary exhibits established.

4. For the sake of convenience, Mario Biaggi will be referred to throughout as either "Mario Biaggi" or just "Biaggi." Richard Biaggi will be referred to as either "Richard" or "Richard Biaggi."

relevant aspects make essentially the same claims. As is clear, however, under the governing legal standards neither Biaggi nor his co-defendants are entitled to a new trial based on this claim since it merely goes to the credibility of a witness.

The conduct for which Mario Biaggi was convicted related to his efforts on behalf of Wedtech Corporation to secure Government military contracts. In essence, he was convicted of extorting stock in Wedtech for these efforts, for fraudulently concealing this stock and his income from these efforts and for other violations in connection with his position as an elected official. Apart from over $900,000 charged by his law firm as "fees" for services, Mario Biaggi extorted two bribes from Wedtech: a grant of 5% of its stock in 1982 for obtaining on its behalf a $27 million Army contract, and a $50,000 payment for exerting influence over public officials and co-defendant Stanley Simon, then-Bronx Borough President, in order to obtain official approval for a lease of One Loop Drive, a property in the Bronx required by Wedtech in order to satisfy Government contracting requirements.[5]

Biaggi introduced himself to Wedtech's two equal shareholders, John Mariotta and Fred Neuberger, after learning of its existence in 1978. At this time Wedtech was known as Welbilt. Biaggi told them that he could be useful to them in securing military contracts, and he and his law firm, Biaggi, Ehrlich & Lang (later just Biaggi & Ehrlich) were retained at a $20,000 annual fee. Mario Biaggi immediately exerted influence on certain officials, lobbying government agencies for contracts on Welbilt's behalf. In 1980, Biaggi demanded that his retainer be upped to $40,000 per annum, and then a year later to $55,000. Both demands were met.

In the late 1970s and early 1980s Biaggi began to intervene with various government officials, federal and state, on behalf of Welbilt, seeking a tremendously large contract for aircraft engines which for the first time

had been placed in the Section 8(a) program.[6] Welbilt eventually received a $900,000 commitment of Federal funds for use in locating and acquiring a building for the engine contracts. However, Welbilt paid the price.

While seeking the contract for Welbilt, Biaggi and Ehrlich learned that Mario Moreno [7] was to receive 9% of the company stock. They, too, desired stock and, as a quid pro quo for their work, the law firm of Biaggi and Ehrlich was granted 5% of the company's stock in 1982. Biaggi also demanded a 5% share of all Government contracts but settled for the grant of shares. Welbilt granted the stock because they feared that without Biaggi's influence with then newly-elected Senator Alfonse D'Amato, they would not be able to obtain the contracts they sought. Welbilt also feared that Biaggi had the power to destroy the company were they to refuse to accede to his demands.

In 1983 Welbilt decided to go public. It retained the services of Main Hurdman, an accounting firm, to conduct the necessary audit. One of the Main Hurdman accountants was Anthony Guariglia whose testimony at Mario Biaggi's trial and whose subsequent trial for perjury form the basis of this motion. Even though Guariglia learned of various fraudulent practices, he nonetheless joined the company in May of 1983. The company name was changed to Wedtech when it went public.

At this time Mario Biaggi and Ehrlich began to demand their shares. The shares were granted but were put in the names of Richard Biaggi, Mario's son and an associate in his law firm. Mario Biaggi filed false tax returns by declaring the income on the returns of Richard Biaggi, in 1983, when the stock was awarded, and again in 1985, when part of it was sold.

An investigation into Wedtech's affairs began in the summer of 1986. During this investigation Mario Biaggi testified falsely before a grand jury that, aside from writing

---

5. Wedtech required this property to test pontoons pursuant to a Navy contract.

6. This was a Government program to place large military contracts with minority-owned firms.

7. Moreno was at times relevant to this motion first consultant to and then an officer of Welbilt and Wedtech.

a few letters in 1978 and 1979, he made no official contacts on Wedtech's behalf.

## II. Richard Biaggi

When Mario Biaggi extorted the grant of 5% of Wedtech's stock, half of the stock was given to his law partner, Ehrlich, and the other half was put in the name of Richard, his son, who was at that time a recently hired associate at Biaggi's law firm. The first drafts of the stock agreement called for the 225,000 shares to be granted to the firm of Biaggi & Ehrlich (GX 15).

Thus, since the stock was really Mario Biaggi's, Richard filed false tax returns for 1983 when the stock was awarded and in 1985 when part of it was sold by declaring the income on his return and not his father's. (GX 40C, 40E, 46A, 46C).

## III. Stanley Simon

Several years after Mario Biaggi introduced himself to the Welbilt principals, his law partner, Ehrlich, introduced Moreno to Stanley Simon, the Bronx Borough President, as an important figure to cultivate. Some time later Ehrlich told Moreno that Simon wanted his brother-in-law, Henry Bittman, to work at Welbilt four days a week, a demand repeated by Simon in person when he met Moreno at a political banquet. Moreno agreed, and Mariotta approved when Moreno explained that Simon had to be placated in order for Welbilt to obtain a building in the Bronx. (Tr. 560–76). Bittman was hired as a clerk on April 13, 1981, and although he was a poor performer, he not only was retained but was even given raises making him the highest paid clerk at the company because of his connections to Simon. (Tr. 615–19, 4021, 4027–44, 4207–11, 10,728–29, 11,584–86: GX 501B).

After the Wedtech public stock offer, Simon demanded a salary increase for Bittman in excess of that earned by other clerks, a demand acceded to because of Moreno's desire to acquire more buildings in the Bronx to perform the pontoon contract. (Tr. 1038–41, 1048, 8967).

When Wedtech received the 1984 Navy contract to build pontoons, Wedtech sought to lease One Loop Drive, a city-owned property located in the Hunts Point section of the Bronx. The final approval for this lease had to come from the New York Board of Estimate, since abolished. Simon, as a Borough President, was a member. He met with Ehrlich and Moreno before the June 27, 1984 meeting of the Board. However, the item did not make the calendar. Later, Ehrlich told Moreno that Biaggi had punished Simon for not having the lease on the calendar by warning him that his next election relied on Biaggi's support and aid. (Tr. 1119). The One Loop Drive Lease was then placed on the July Calendar of the Board. Simon supported it and it was approved. (Tr. 1115–20, 5111–20, 5130–36, 6932–34).

After this approval Ehrlich notified Moreno that Wedtech would have to pay an additional $50,000 fee over its retainer because of work spent to convince the Borough Presidents, including Donald Manes of Queens. (Tr. 1123). Biaggi stated that the fee was minor in proportion to the work done to secure the approval. (Tr. 1121–24, 11,569–79).

At a 1984 function at Yonkers Raceway, Simon told Neuberger personally that due to an upcoming campaign, Simon expected a contribution of $75,000 to $100,000. When Neuberger expressed reluctance due to the illegality of such a contribution, Simon told him the money could come in the form of donations to charities and other expenses. Neuberger agreed to pay $50,000 for the pending One Loop Drive Lease and for other things Simon could do for Wedtech.

Simon also asked Moreno to give Bittman an additional raise of $10,000. A $5,000 raise was given. (Tr. 1124–31, 4501–04, 967–70, 9008–09, 10,885–911, 11,579–84).

Simon remained unsatisfied with the $50,000 payment and in 1985 in his office Simon asked Moreno for use of Moreno's Atlantic City apartment and "some cash" to gamble. Moreno instructed Ceil Lewis to stuff an envelope with $10,000 in cash which Lewis gave to Simon with the keys to Moreno's apartment. (Tr. 1341–45, 1351–55, 4559–60, 10,912–15).

Simon also extorted Ralph Lawrence and Sabino Fogliano. Lawrence was a New York City government employee given a job in Simon's office in exchange for kickbacks from Lawrence's salary increases.

Fogliano was a Bronx contractor who Simon met in 1983. Simon would have Fogliano take him out to lunch to talk about construction opportunities. Simon helped Fogliano arrange meetings with city agency officials for the purpose of securing city government contracts.

In exchange, Fogliano accompanied Simon, his family, and Lawrence on a trip to Rome and paid Simon's hotel and restaurant bills. After returning from Rome Fogliano was approved as a qualified contractor for the Department of Housing, Preservation, and Development, and won a bid to do work for a nursing home in the Bronx.

After Wedtech collapsed, Simon testified falsely before a grand jury investigating political corruption in the Bronx. He denied that he ever received anything of value or had been offered cash in connection with his duties as Borough President.

## IV. The Legal Standard Under Rule 33

Witness Guariglia was convicted of perjury. At trial he stated that he had stopped gambling when the opposite was in fact the case. He also stated that he committed no further crimes when he had in fact skimmed cash from A & H Toys. The newly discovered evidence that forms the basis of the instant motions is from Guariglia's subsequent perjury trial for false testimony given in the trial of *United States v. Wallach*, 935 F.2d 445 (2d Cir.1991).

■ Rule 33 motions for a new trial "are granted only with great caution ... in the most extraordinary circumstances." *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988) (citing *U.S. v. DiPaolo*, 835 F.2d 46, 49 (2d Cir.1987); see also *U.S. v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975), cert. den. 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). A district court should only grant Rule 33 motions in the most extraordinary of circumstances, i.e. when the new evidence would probably lead to an acquittal. *U.S. v. Imran*,

964 F.2d 1313, 1318 (2d Cir.) cert. den. 113 S.Ct. 626, 121 L.Ed.2d 558 (1992); *U.S. v. Gordils*, 982 F.2d 64, 72 (2d Cir.1992), cert. den. —— U.S. ——, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993).

### The Government's Culpability

■ The culpability of the Government is central where the newly-discovered evidence concerns the purportedly false testimony of a Government witness. If the Government either knew or should have known that the witness was perjuring himself, a new trial must be granted if the new evidence *might* have altered the jury's verdict. *Sanders*, 863 F.2d at 225; *Wallach*, 935 F.2d at 456. The test is whether there is any reasonable likelihood that the false testimony would have affected the judgment of the jury. *U.S. v. Wallach*, 979 F.2d 912, 914 (2d Cir.1992) (*Wallach II* ).

■ If the Government was unaware of the perjury at trial, a new trial is required only if the new evidence goes to an issue so material that it would probably result in acquittal upon retrial. *Sanders*, 863 F.2d at 225; *Wallach*, 935 F.2d at 456. This standard is met only if the perjured testimony would "leave the court with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders*, 863 F.2d at 226; *Wallach*, 935 F.2d at 456; *Wallach II*, 979 F.2d at 914.

■ In ascertaining whether or not the defendant would have been acquitted, several factors must be considered. First, the trial court must determine whether the false testimony related to the merits of the case, or merely to tangential questions concerning misconduct by the witness. *U.S. v. Rosner*, 516 F.2d 269, 273–74, 279–80 (2d Cir.1975), cert. den. 427 U.S. 911, 49 L.Ed.2d 1203 (1976). Secondly, the court must determine whether the new information would have provided merely additional, cumulative, impeachment information. *Id.* Third, the court must evaluate the existence of evidence independent of the witness's testimony establishing the defendant's guilt. *Id.* at 274–78.

Thus, where the newly discovered perjury concerns solely the witness' credibility, and

the perjury is merely additional information "tending further to impeach the credibility of a witness whose character has already been shown to be questionable," then it is unlikely that the jury would have acquitted on this basis, especially if there is "ample independent evidence" supporting the guilty verdict. *U.S. v. Gilbert*, 668 F.2d 94, 96 (2d Cir.1981) cert. den. 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982).

## V. Analysis of the Facts in Light of the Legal Standard

For Mario Biaggi, Richard Biaggi, and Stanley Simon, Guariglia was not the centerpiece he was in *Wallach*. Given the corroborating evidence, a conclusion that the jury would have acquitted had it known of Guariglia's perjury is unwarranted and unproven.

### A. Mario Biaggi

■ Here, the Government argues persuasively that the evidence does not permit the inference that the Government was aware of the perjury of its witness or that it consciously avoided the awareness of perjury. For example, in contrast to *Wallach*, there was no bolstering of Guariglia's testimony. In *Wallach*, the defense on cross-examination confronted Guariglia with documentary evidence that he gambled on two instances in fall of 1988. Thereafter the Government attempted to rehabilitate Guariglia by having him testify on redirect that he had not gambled. In the instant case, since there was no such bolstering, the inference of Government awareness of the perjury would be inappropriate.

In *Wallach*, much emphasis was placed by the Court of Appeals on the extensive bolstering of and vouching for Guariglia's veracity by the Government. See, e.g. *Wallach*, 935 F.2d at 458–59. The "point was that a jury, aware of the falsity of Guariglia's sworn denial of gambling, would have likely disbelieved his accusations against Wallach, and disbelief of those accusations would likely have left the jury with evidence unlikely to have persuaded it beyond a reasonable doubt

of Wallach's guilt." *Wallach II*, 979 F.2d at 914. This standard is not met here as there was ample evidence besides Guariglia's testimony to persuade the jury beyond a reasonable doubt of the guilt of Mario Biaggi, Richard Biaggi, and Stanley Simon.

More importantly, however, the major difference between the Biaggis and Simon and Wallach is the respective importance of Guariglia's testimony to the respective trials. The case of *U.S. v. Wallach*, 935 F.2d 445 (2d Cir.1991) is unavailing to petitioners because in that case Guariglia's and Moreno's testimony was found to be "the *only* testimony that directly linked the defendants with the admittedly illegal conduct of Wedtech." 935 F.2d at 455 (emphasis supplied). It "was the centerpiece of the government's case." *Id.* at 457.

Here, however, Guariglia was neither the only centerpiece of the Government's case nor one of two witnesses who "tied all the pieces together." 935 F.2d at 457. Biaggi argues that all of the corroborating evidence was obviously false so that the jury must have relied solely on Guariglia's testimony. (See Biaggi's Reply, 27–44). Oddly, this claim was not brought up in Biaggi's motion until the Government's Answer discussed at length the corroborating evidence.

Guariglia testified for a day and a half on direct. He was cross-examined for about six days during the five month trial.

Also, the core of the trial involved the charges of Biaggi's extortion of the 5% of the Wedtech stock which occurred well before Guariglia became affiliated with the company in May of 1983.[8]

The review of Guariglia's direct testimony reveals that he had only three face-to-face contacts with Biaggi. (Tr. 11,473–76, 11546–48, 11,568–70). The first meeting concerned the feared dilution of the 5% of the Wedtech stock after the company went public. The second concerned the stock purchase agreements which formed the basis for Count 13 and of which Mario Biaggi was acquitted. The third meeting concerned One Loop

---

**8.** As Biaggi notes, the 5% agreement was not finalized until after Guariglia became involved in the affairs of Wedtech. It was, however, extorted before Guariglia's affiliation. (See Biaggi's Reply, 14).

Drive. According to the Government, and unrebutted by Biaggi, these accounts were all corroborated by other witnesses and documentary evidence.

Biaggi claims that the Government "acknowledged Guariglia as the 'pivotal' witness for both the Wallach and Biaggi trials." (Biaggi's Rule 33 Motion For a New Trial, 55) (emphasis in original). However, as the testimony cited just the page before indicates, the actual testimony of Assistant U.S. Attorney Mary Shannon at Guariglia's perjury trial was that "Guariglia was considered to be, by me and others, to be a pivotal witness in virtually all of the Wedtech investigations because Mr. Guariglia had been in all of the transactions with which we were dealing and because Mr. Guariglia was able to recreate the events with greater accuracy than some of his colleagues." (Id. at 54). In the first place, being a pivotal witness is not equivalent to being the centerpiece. Secondly, this testimony refers to the investigation of Wedtech, not to the trial of Biaggi. As is obvious from the testimony attached as Exhibit K to Biaggi's motion, AUSA Shannon is discussing Guariglia's role in the multi-year investigation of Government corruption, part of which eventuated in the Biaggi trial.

Thus, since Guariglia's testimony was neither the centerpiece of the trial and was fully corroborated, the perjury should not alter the result. There were six days of cross-examination of Guariglia; it is unlikely that the three instances of perjury cited by petitioners would have altered the verdict. U.S. v. Petrillo, 821 F.2d 85, 88 n. 2 (2d Cir.1987).

In addition, at trial the jury was advised to scrutinize Guariglia's testimony with greatest of wariness. In charging the jury much effort was taken to instruct the jury that the testimony of an accomplice, such as Guariglia, was to be "received with caution and weighed with great care." (Tr. 20,082).

Specifically, the jury was instructed as to the testimony of accomplices such as Guariglia that the fact that they "sought and obtained from the government a benefit for themselves in return for their testimony here requires that you view their testimony with suspicion, weighing it with great care, subject it to close and searching scrutiny." (Tr. 20,085). The jury was instructed explicitly that since Guariglia was a convicted felon his testimony should be subject to "close and searching scrutiny." (Tr. 20,086).

In its own direct examination of Guariglia the Government brought out his history of crimes and misconduct. In their cross-examination, petitioners also addressed this issue. There is therefore no reason to believe that if the jury had knowledge of Guariglia's perjuries that it would have acquitted petitioners. It would only be cumulative impeachment evidence of an already impeached witness whose testimony the jury was instructed to regard with searching scrutiny.

Petitioners merely claim that Guariglia's testimony was central to the convictions. The Government in response then proves, with numerous citations to the record and to the evidence at the trial, that it was not. Petitioners do not contravert the Government's argument. In fact, in the case of Richard Biaggi and Stanley Simon they do not even bother to respond to it at all.

### B. Richard Biaggi

■ Richard deposited the money he "earned" on the stock sales into a savings account as did Ehrlich. Ehrlich's was deposited into a joint account which he shared with his wife, but Richard's was deposited only in his name, although he was married, and he withdrew only enough money to pay taxes and one other comparatively small sum. Moreover, as noted by the Government, while Richard owed money on two mortgages with 14% interest, he had hundreds of thousands of dollars deposited in the savings account that only earned 6% to 7%. (Tr. 920–22, 5653–71, 5704–16; GX 30A, 30B, 43A–P, 44A–V, 58, 58 A–C, 59, 59 A–C). The Government, therefore, implied that the money was not his and that his awareness of this explains why he never spent the money he "earned" from the sale of "his" stock.

Richard Biaggi's conviction on Counts Sixteen and Seventeen for filing false tax returns is amply supported by other evidence. Other cooperating witnesses testified that the stock was really Mario Biaggi's (Tr. 751–58, 6773–74).

Additionally, Irwin Wolf, Biaggi and Ehrlich's accountant, wrote to Ehrlich to consult him on the tax consequences of "you and the Congressman receiving 112,500 shares of stock." (GX 905A0). In 1985, Ehrlich asked for a tax analysis assuming the stock ownership was 40% Mario Biaggi, 20% Ehrlich, and 40% Richard Biaggi (Tr. 5832–51, 6204–09; GX 902, 903) and in 1986 Biaggi met with the accountant and rearranged the ownership as 60% Richard Biaggi, 40% Ehrlich. (Tr. 6079–81).

As the Government points out, Richard could not have received the shares for any services rendered to Wedtech. When the stocks were received in Richard's name in July, 1983 (worth almost $2 million two months later when Wedtech went public) he had only been practicing law for nine months and had spent little time on the Wedtech account. (Tr. 871–78, 5183–85, 6386–95, 6797, 8030, 8922). Richard Biaggi was not then a partner in the firm. (Tr. 5047–50, 5355, 5800–05, 7978, 8127–31, GX 7A, & B, 18A–D). The evidence was ample that he was a nominee and that he knew it.

Thus, the Government argues convincingly, that given the volume of corroborating evidence and the extensive cross-examination of Guariglia, this case is more like *U.S. v. Petrillo*, 821 F.2d 85 (2d Cir.1987), than *Wallach*. See also *U.S. v. Diaz*, 922 F.2d 998, 1007 (2d Cir.1990), cert. den. — U.S. —, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991).[9]

Richard Biaggi's argument, which has no citations to the record or to the evidence introduced at trial, is that without Guariglia's testimony all the evidence against Richard would collapse. However, he does not support this contention at all. The Government's marshalling of the corroborating evidence against Richard Biaggi is convincing argument that his Rule 33 motion should not be granted.

### C. Stanley Simon

■ There was substantial and ample evidence outside the testimony of Guariglia to support Simon's convictions for accepting bribes from Wedtech, extorting funds from Ralph Lawrence, and evading taxes. Documentary evidence showed that Simon received payments from the Wedtech FHJ slush fund and that payments to restaurants were made on Simon's behalf. (GX 73A). Both Moreno and Neuberger, in addition to Guariglia, testified to Simon's extortion of $50,000 from Wedtech. (Tr. 1124–31, 9008–09, 11,579–84).

Former Wedtech bookkeeper Ceil Lewis testified that FHJ checks made payable to cash and FHJ reimbursements of Simon's restaurant bills was the method of paying Simon. She also testified that Lawrence picked up checks and cash on Simon's behalf. (Tr. 4501–04).

Moreno testified to giving $10,000 of the $50,000 to Simon for Atlantic City gambling and to giving him gambling chips there on other occasions. (Tr. 1351–64).

Lawrence also testified at length as to his payment of Simon's hotel, meal, transportation and entertainment expenses while Simon was Borough President and he served as Simon's advance man. (Tr. 10,752–61, 10,-773–884).

Simon never questions the fact that there were numerous witnesses who testified to his criminal actions and that there was much documentary evidence in support of his conviction. His contention instead is that if the jury had known of Guariglia's instances of perjury, the entire Government case would somehow fall apart.

Government witness previously employed at Wedtech incriminated Simon for extorting $50,000 from Wedtech with respect to Wedtech's application to obtain a lease at One Loop Drive from the New York City Board of Estimate. Although several such witnesses testified, there can be no ques-

---

9. To the extent that Richard Biaggi asserts as the basis for a new trial the alleged improper joining of his tax fraud counts with those against the other defendants, he is barred from raising this claim. In the direct appeal of his conviction this issue was raised and rejected. *U.S. v. Biaggi,* 909 F.2d 662, 676 (2d Cir.1990), cert. den. — U.S. —, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). A litigant is barred from raising, post-trial, issues raised and decided on direct appeal. *Cabrera v. U.S.,* 972 F.2d 23, 23 (2d Cir.1992).

tion that Anthony Guariglia was one of the principal Government witnesses against Simon on this fundamental charge. If the jury was aware that Guariglia was committing perjury on the stand, as is shown by the motion papers of Mario Biaggi, it almost certainly would have discredited his entire testimony. This in turn would have caused the jury to question seriously the entire case against Simon.

(Memorandum of Law in Support of Stanley Simon's Rule 33 Motion for a new trial, 2). To assert, however, is not to prove. Simon does not even attempt to prove this assertion by references to the record. The Government's ample citations to the record and to the evidence at trial remain unrebutted, and indeed, uncommented on, by Simon. Except for Simon's talismanic invocation of *Wallach*, he provides no citation to the record, and presents no case law whatsoever in support of his motion, relying instead entirely on the motion papers of co-defendant Mario Biaggi. In fact, although there have been numerous extensions granted as to these motions, Simon disregarded this court's April 8, 1993 Order that his Reply to the Government's Answer be submitted by June 4, 1993. Instead, Simon only replied to the timeliness issue argued by the Government, telling the court that he was "writing to respond to only the timeliness issue raised by the Government." (Letter of May 20, 1993, in Reply to the Government's Opposition to the Rule 33 Motions of Stanley Simon and Richard Biaggi, 1).

Simon even notes that corroborating his conviction was the testimony of Fred Neuberger, Ralph Lawrence, and Sabino Fogliano but claims that only if the jury knew of Guarigli's testimony that all the evidence against Simon would somehow magically disappear and appear incredible. This assertion is untenable and unsupported.

## VI. Timeliness of the Rule 33 Motions of Richard Biaggi and Stanley Simon.

 The Government also contends that the Rule 33 motions of Richard Biaggi and Stanley Simon are defective in that they are untimely. The Government notes that Rule 33 motions must be filed within two years of termination of the appellate process and contend that the issuance of a mandate of affirmance of conviction by the Court of Appeals is such a termination.[10] Petitioners Richard Biaggi and Stanley Simon disagree, claiming in their May 20, 1993 Letter in Reply that this court's July 31, 1991 Rule 35 amendment of their sentences amounts to a final judgment. Movants also claim that the appellate process is not terminated until the Supreme Court either decides or denies certiorari. According to movants, while most other Circuits have rules in accordance with the Government's position here, the Second Circuit has not so decided.

The Government's position is the correct one. In the first place, movants provide no case law to support their contentions that either the granting of a Rule 35 motion or the denial of certiorari amounts to a final judgment. Rule 35 is directed toward sentencing, not toward conviction or acquittal. It does not alter the fact of conviction. It is in no way a "final judgment" as contemplated by Rule 33 but is instead an amendment to the consequences of judgment.

Secondly, Second Circuit case law is in agreement with the Government. In *U.S. v. Mallah*, 427 F.Supp. 328, 331 (S.D.N.Y.), aff'd without op. 559 F.2d 1205 (2d Cir.1977) the court held that final judgment issues with the circuit court's issuance of its mandate affirming the conviction. In doing so, it relied on *Oddo v. U.S.*, 171 F.2d 854, 858 (2d Cir.), cert. den. 337 U.S. 943, 69 S.Ct. 1498, 93 L.Ed. 1747 (1949). These cases are still good law, and petitioners have provided no case law to the contrary. Thus, even were there good reason to grant the Rule 33 motions of Richard Biaggi and Stanley Simon on the merits, they cannot be granted on the grounds that they are time-barred.

## VII. Conclusion

For the reasons discussed above, all motions are denied.

_____

**10.** Rule 33 states, in relevant part, that a "motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment."