JED S. RAKOFF, U.S.D.J.
On December 21, 2017, the Court issued a bottom-line order granting defendant Kevin Walker's motion for a new trial and denying his motion for an acquittal. ECF No. 157. This Memorandum sets forth the reasons for these rulings.
Background
On March 30, 2017, following a five-day trial, a jury convicted Kevin Walker of interstate robbery in violation of the Hobbs Act, 18 U.S.C. § 1951 ; conspiracy to commit Hobbs Act robbery; and a firearms offense in violation of 18 U.S.C. § 924(c). The substantive Hobbs Act conviction was based on a robbery that took place on February 5, 2015. See Verdict Sheet, ECF No. 80.
The Government's main witness at trial was Tyrone Walker, Kevin's co-defendant and brother, who gave the jury "the inside details on the robbery scheme." Transcript dated Mar. 24, 2017 at 789:23-24, ECF No. 91 (Government summation). Tyrone testified that it was Kevin's idea to rob delivery trucks together with their brother, Melvin Walker, as well as two other accomplices named "Jab," and "Brad." See Transcript dated Mar. 22, 2017 ("Mar. 22 Tr.") at 482:22-23, ECF No. 86 ("Q. So, at this meeting, whose idea was it to commit robberies? A. Kevin's."). Tyrone also testified repeatedly that Kevin provided the two guns that the crew allegedly used during their robberies. See id. at 506:17-20 ("Q. Whose guns were they? A. Kevin's. Q. Where did he keep the guns? A. In his room."); Transcript dated Mar. 23, 2017 ("Mar. 23 Tr.") at 634:18-23, ECF No. 89 ("Q. So about the guns, you said that you knew they were real, right? ... A. Yes. Because I know Kevin wouldn't get no *563 fake guns so, yes, I knew they were real."); Mar. 23 Tr. at 635:12-13 ("Q. And where are those guns now? A. I don't know. You have to ask Kevin."). He also testified that he, Kevin, and others involved in the robberies would gather at Kevin's mother's house after the robberies. Mar. 23 Tr. at 648:18-24, 649:21-24.
Tyrone further testified that Kevin borrowed his car to use in additional robberies in which Tyrone did not himself participate-including the February 5 robbery that served as the basis for Kevin's substantive Hobbs Act conviction. See Mar. 22 Tr. at 532:7-17; Mar. 23 Tr. at 662:13-17; see also Defendant Kevin Walker's Motions for Acquittal and/or New Trial Pursuant to Fed. R. Crim. Pro. 29 and 33 ("Def. Mem.") at 6, ECF No. 122. Tyrone testified that he knew what happened during the February 5 robbery, although he was not there, because he received a call from Kevin that day asking him to report his car stolen because Jab had fired a shot during the robbery. See Mar. 22 Tr. at 532:24-533:22.
On August 23, 2017, nearly five months after the conclusion of the trial, the Government informed the Court that it would be disclosing new information about an unnamed cooperating witness (later identified as Tyrone) who had testified against Kevin at trial. See Order dated Aug. 23, 2017, ECF No. 121. The Court set a schedule for the Government's disclosure as well as briefing and oral argument on any motions made by the defendant on the basis of the Government's disclosure. Id. On September 8, the Government shared with defendant new information it had obtained from a newly cooperating witness-then-identified as "Witness-1" and now known to be Melvin Walker, Kevin and Tyrone's brother and co-defendant-indicating that Tyrone had perjured himself during defendant's trial. See Declaration of Meredith S. Heller in Support of Kevin Walker's Motions Pursuant to Rule 29 and 33 ("Heller Decl.") at Ex. B, ECF No. 124.
Most significant for purposes of the instant motion, Melvin informed the Government (a) that Tyrone provided one of the two guns used in the robberies, whereas at trial Tyrone testified that the two guns used in the robberies were Kevin's; and (b) that Tyrone was at the February 5, 2015 robbery, whereas at trial Tyrone testified that he was not present at that robbery. Melvin also told the Government (c) that after some robberies, the robbery crew went to Tyrone's apartment, not the apartment of Kevin's mother. See Heller Decl. Ex. B.[1]
Kevin moved for a new trial and/or a judgment of acquittal on the basis of the Government's disclosure. ECF No. 122. The Court heard oral argument on Kevin's motion on November 13, 2017. See Transcript dated Nov. 13, 2017, ECF No. 147. At the close of that proceeding, in part because the Government had not submitted even an affidavit attesting to when and how it learned that Tyrone may have perjured himself during the trial, the Court scheduled an evidentiary hearing to learn more of the facts underlying the Government's investigation. See id. at 3:5-18, 5:16-24. In particular, the Court sought to determine whether the Government knew or should have known of Tyrone's alleged *564 perjury prior to the conclusion of trial. See id. at 4:23-5:6.
During this evidentiary hearing, New York City Detective Michael McCready, who was involved in the Government's investigation, testified that Tyrone's first proffer session was held on March 8 (not earlier because Tyrone only sought to cooperate shortly before trial) and that the Government thereafter held an hours-long proffer session "every other day" or "close to that" until the start of Kevin's trial on March 20. Transcript dated Nov. 27, 2017 ("Hearing Tr.") at 44:15-17, 46:11-14, ECF No. 149. Despite the time limitations, the Government made efforts to verify Tyrone's information both prior to and, to a lesser extent, during and after these proffer sessions. See id. at 15:19-16:1 (prior to proffer sessions); id. at 20:20-25 (during and after the proffer sessions). For example, Detective McCready and others were able to corroborate some of Tyrone's information through "cell phone data, license plate reader data, knowledge of ownership of vehicles," and videos of the robberies. Id. at 17:9-14, 47:5-17. Detective McCready explained that the Government had some concern during the proffer sessions about Tyrone's cell phone, specifically, "the cell phone itself and in terms of how often it was used." Id. at 18:25-19:1. Tyrone told the Government that he could not remember the password to the cell phone, which Detective McCready believed. Id. at 20:13-14. The Government did not gain access to the contents of this cell phone until late September 2017. See Government's Memorandum in Opposition to Defendant's Motion for a Judgment of Acquittal or a New Trial ("Gov't Mem.") at 7-8 n.1, ECF No. 127.
The Government did not make contact with Melvin or his counsel until after Kevin's trial. Hearing Tr. at 21:10-17.[2] Based on information the Government had received from Tyrone, the Government issued an arrest warrant in approximately May 2017 and arrested Melvin in the beginning of June 2017. Id. at 21:15-20. Melvin and/or his counsel first made a proffer around August 2017. Id. at 21:21-25, 52:23-53:2. "[T]he information supplied during the proffer sessions with Melvin raised some inconsistencies or some contradictions, and at that point that information was looked into." Id. at 22:7-9.
Melvin also testified at the evidentiary hearing. He stated that about a week after he arrived at the Metropolitan Correctional Center ("MCC"), Kevin "called [him] down to the law library." Id. at 54:24-25. Kevin explained that he wanted Melvin's help in proving that Tyrone had lied to the Government. Id. at 55:8-10. Kevin himself was focused on Tyrone's testimony that Kevin had provided him with the telephone Tyrone used during the robberies, which Kevin thought was false. Id. at 56:22-57:2. Kevin asked Melvin "to look through everything" in the trial transcripts to find discrepancies, which Melvin then did. Id. at 54:24-55:10.
Melvin identified several untrue statements in Tyrone's testimony based on Melvin's personal knowledge. For example, and most relevant here, Melvin testified that he knew that one of the guns used during the robberies belonged to Tyrone (contrary to Tyrone's testimony) because "[h]e and Tyrone went to go get it the day that Kevin came home [from prison]. We brung it downstairs to Kevin." Id. at 57:13-22; see also id. at 61:23-25, 65:7-14.
*565 Melvin also explained that he knew that Tyrone was present at the February 5, 2015 robbery because Tyrone had told him so in April or May of 2016. Id. at 58:10-16. Finally, Melvin believed that the crew "always" went to Tyrone's house after the robberies because Melvin "always dropped off Jab and Brad" there. Id. at 59:13-20.
Discussion
I. Motion for a New Trial
Upon a defendant's motion, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "[W]hen a trial has been tainted by false testimony, th[e] Court is 'called upon to strike a fair balance between the need for both integrity and finality in criminal prosecutions' by determining whether false testimony was prejudicial in the sense that it affected the outcome of the trial." United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006) (quoting United States v. Stofsky, 527 F.2d 237, 239 (2d Cir. 1975) ). The trial court's discretion "is broad because its vantage point as to the determinative factor-whether newly discovered evidence would have influenced the jury-has been informed by the trial over which it presided." Stewart, 433 F.3d at 296-97 (citing United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995) ).
"[W]hen the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." United States v. White, 972 F.2d 16, 20 (2d Cir. 1992) (citing United States v. DiPaolo, 835 F.2d 46, 49-51 (2d Cir. 1987) ). Here, the Government does not meaningfully dispute that there is a substantial possibility that Tyrone committed perjury. See Government's Reply Memorandum in Opposition to Defendant's Motion for a Judgment of Acquittal or a New Trial ("Gov't Reply"), ECF No. 153 (referring repeatedly to the "allegedly perjured testimony" but nowhere actually disputing that Tyrone committed perjury). Of course, it is possible that it is Melvin, rather than Tyrone, who is lying; but the Government, based on its own assessment, has itself decided to credit Melvin over Tyrone. See id. at 7 (crediting Melvin, whose testimony "contradict[s] Tyrone Walker's testimony," over Tyrone). Indeed, it is hard to see how the Government could have entered into a cooperation agreement with Melvin if it still fully credited Tyrone. In any event, the Court, based on its observation of both Melvin and Tyrone under oath, concludes that it is more likely than not that Tyrone committed perjury.[3]
A second threshold inquiry is whether Melvin's testimony was "newly discovered." United States v. Owen, 500 F.3d 83, 87 (2d Cir. 2007). Evidence is "newly discovered" only if "the evidence could not with due diligence have been discovered before or during trial." Id. It is true that the defense might have approached Melvin before the trial, although in fact it appears that the effort was only undertaken after the trial.[4] But because Tyrone only entered into a cooperation agreement with the Government just days *566 before trial, the defense had little advance warning of what Tyrone would say. Moreover, the most critical new information is that the Government now credits Melvin over Tyrone, which the defense had no way of knowing before the trial because the Government only approached Melvin after the trial.
Courts in the Second Circuit apply two different standards when determining whether to grant a new trial based on newly discovered evidence that a Government witness likely perjured himself: "If the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury." Stewart, 433 F.3d at 297 (quoting United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) ). "On the other hand, if the prosecution was not aware of the perjury, a defendant can obtain a new trial only where the false testimony leads to 'a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.' " Id. (quoting Wallach, 935 F.2d at 456 ).
The Government has demonstrated to the Court's satisfaction that the prosecution in this case did not know, and had no reason to know, of the perjury prior to the conclusion of Kevin's trial. Detective McCready credibly testified that the Government took appropriate steps to ascertain whether Tyrone's information was accurate prior to trial and found it corroborated by other evidence the Government had acquired in support of its case. Hearing Tr. at 17:9-14, 47:5-17. It is true that the proffer sessions began in the same month that Kevin's trial began, see id. at 44:2-18, resulting in a "rather hectic schedule prior to trial" and an allegedly inadequate investigation, Defendant Kevin Walker's Post-Hearing Brief in Support of His Motion for a New Trial Pursuant to Fed. R. Crim. Pro. 33 ("Def. Post-Hearing Br.") at 4-8, ECF No. 154. But while this condensed schedule may have made the Government's assessment of Tyrone's credibility less than perfect, it does not support an inference that the Government should have known that Tyrone may not have been entirely truthful during his proffer sessions. Nor does Tyrone's statement that he could not recall the password to a cell phone that the Government had recovered almost two years earlier and that Tyrone only used for at most a year. See Def. Post-Hearing Mem. at 4-6. The Court finds that although the Government might have been more thorough, the Government did not intentionally or recklessly introduce perjury. See, e.g., Banks v. Charles, 721 F.Supp. 470, 472 (W.D.N.Y. 1989) ("In the absence of any indication of recklessness, it is simply too great a burden to expect that a prosecutor ascertain the veracity of every shred of testimony."); Vail v. Walker, No. 96-CV-578, 1999 WL 34818638, at *3 (N.D.N.Y. Aug. 24, 1999) ; United States v. Zappola, No. 90-CR-504, 1995 WL 116296, at *8-9 (E.D.N.Y. Feb. 28, 1995).[5]
*567 Furthermore, it is totally unrealistic to think that, even if the Government had reached out to Melvin in the short space before trial, Melvin would have cooperated in any way at that stage. Therefore, Kevin's motion for a new trial should be granted only if Kevin most likely would not have been convicted had the jury known that Tyrone had lied on the stand. Courts consider several factors in ascertaining whether the defendant would have been acquitted had the jury known about the perjury, including "whether the new information would have provided merely additional, cumulative, impeachment information," "whether the false testimony related to the merits of the case, or merely to tangential questions concerning misconduct by the witness," and "the existence of evidence independent of the witness's testimony establishing the defendant's guilt." United States v. Biaggi, 823 F.Supp. 1151, 1156 (S.D.N.Y. 1993).
The Government maintains that Melvin's information is merely cumulative impeachment and a new trial is not warranted because Tyrone's perjury does not directly "bear[ ] on Kevin Walker's guilt or innocence." Gov't Reply at 9-10. But courts in the Second Circuit distinguish perjury that "involves some collateral matter concerning the witness," which would not suffice if the witness was already impeached, and "testimony about facts relevant to the merits of the case." United States v. White, 972 F.2d 16, 20-21 (2d Cir. 1992) (emphases added). Critical portions of Tyrone's perjury relate directly to the merits of the Government's case against Kevin. Tyrone testified that both guns used in the robberies belonged to Kevin. In fact, it now appears likely that one of the guns belonged to Tyrone. Tyrone testified that he was not present at the February 5, 2015 robbery. In fact, it now appears likely that Tyrone did participate in that robbery. This newly disclosed evidence went to "the heart" of the Government's case: the nature of Kevin's participation in the robberies.
Although there was evidence at trial independent of Tyrone's testimony tending to establish Kevin's guilt, the interests of justice require granting a new trial. When "deciding whether to grant a motion for a new trial, 'the judge is not required to review the evidence in the light most favorable to the prosecution.' " United States v. Levy, 594 F.Supp.2d 427, 435 (S.D.N.Y. 2009) (quoting United States v. Coriaty, No. 99-CR-1251, 2001 WL 1910843, at *2 (S.D.N.Y. July 16, 2001) ). Here, in view of the centrality of Tyrone's testimony to the Government's case, the Court is left with a "firm belief" that "had the misrepresentations been exposed at trial," Kevin would most likely not have been convicted. Stewart, 433 F.3d at 297, 299-200 (internal quotation omitted); see also Wallach, 935 F.2d at 457 (granting new trial where newly discovered evidence was mere impeachment evidence because witness was "the centerpiece of the government's case"). Accordingly, the Court grants defendant's motion for a new trial.
*568 II. Motion for a Judgment of Acquittal
Defendant has also moved for a judgment of acquittal based on Tyrone's likely perjury. A court may set aside a jury's guilty verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c)"only if it finds that the evidence on that count is 'insufficient to sustain a conviction.' " United States v. Zongo, No. 15-CR-319, 2017 WL 2297010, at *1 (S.D.N.Y. May 24, 2017) (quoting Fed. R. Crim. P. 29(c) ). "In considering such a challenge, [the court] must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008) (internal citations omitted). "[A] guilty verdict might survive a Rule 29(c) motion [for a judgment of acquittal] ... but fail to meet the Rule 33 standard [for a new trial]" because of the difference between the standards of review. See United States v. Ferguson, 246 F.3d 129, 139 n.1 (2d Cir. 2001). That is the case here. Viewing the evidence in the light most favorable to the Government, a reasonable jury might have found Kevin guilty beyond a reasonable doubt based on the combination of those portions of Tyrone's testimony that the jury found were still reliable despite his perjury on other matters, plus the testimony of Kyell Clay as to Kevin's participation in another robbery, the cell-site data placing Kevin's phone in the vicinity of most of the robberies, and the physical evidence that Kevin participated in the February 5 robbery. See Gov't Opp. at 16-17; Gov't Reply at 13-15.
For the foregoing reasons, Kevin Walker's motion for a new trial and/or a judgment of acquittal is granted with respect to the new trial and denied with respect to the judgment of acquittal. The Clerk is hereby directed to close the entry at docket number 122.
SO ORDERED.

Less relevant here, Melvin also identified certain information that Tyrone omitted from his testimony, such as that another robbery was part of the alleged conspiracy and that another individual, "Nate," also participated in at least one robbery. See Heller Decl. Ex. B. Melvin also informed the Government that Tyrone was involved in committing robberies in the early 1990s, sold heroin in Pennsylvania in 2016, and was arrested for a firearms offense in 2004. Id. Separately, the Government learned from NYPD reports that Tyrone was identified as a perpetrator in a shooting that took place in or about 1997, though no charges had been brought. Id.

According to Detective McCready, he and the other investigators did not reach out to Melvin prior to Kevin's trial to confirm the information provided by Tyrone because the Government was concerned about "collusion, flight, [and] loss of evidence," given that the Government was not "prepared at that time to make an arrest." Hearing Tr. at 16:23-17:8.

For purposes of Rule 33, it is not necessary that the Court reach this conclusion beyond a reasonable doubt. Moreover, since Tyrone was not a party to the instant motion proceedings, the Court's conclusion that Tyrone likely committed perjury is subject to reconsideration in connection with Tyrone's sentencing if his counsel wishes to challenge it.

It is also true that Melvin testified that he himself only knew certain impeaching information-the robbery omitted from Tyrone's testimony and Tyrone's 2004 gun incident-because Kevin alerted him to these facts at the MCC. Gov't Reply at 9. This testimony is relatively strong evidence that Kevin was aware of this particular impeaching information at the time of trial. This particular impeaching information, however, is merely cumulative impeaching material that does not bear on the Court's decision to grant a new trial.

Since the Government was unaware of the perjury prior to the conclusion of the trial, a new trial also is not warranted on the basis of any due process violation. See Def. Mem. at 3-6 (arguing that the Government's failure to disclose information within its control and that could have been used as impeachment evidence deprived Kevin of his right to due process). Under Brady and Giglio, a defendant has been deprived of his due process rights when the Government failed to disclose "evidence favorable to an accused," including evidence bearing on the credibility of a Government witness, and "the evidence is material either to guilt or punishment." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). A defendant seeking a new trial based on a Brady/Giglio violation must demonstrate, among other things, that the evidence was "suppressed" by the Government. Strickler v. Greene, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The Government cannot "suppress" evidence of which it is unaware. See United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) ("The government has an affirmative duty to disclose favorable evidence known to it." (emphasis added) ); United States v. Erbo, No. 97-CR-1105, 2006 WL 2165739, at *4 (S.D.N.Y. July 31, 2006) ("[T]he Government cannot be faulted for disclosing that which it did not know.").