**UNITED STATES of America**

v.

**Stephen Michael LEVY, a/k/a "Reallybad@aol.com," a/k/a "Steve Levy," Defendant.**

**No. 07 Cr. 680 (DC).**

United States District Court, S.D. New York.

Jan. 27, 2009.

---

**11.** *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Lev L. Dassin, Esq., Acting United States Attorney for the Southern District of New York, by Adam S. Hickey, Esq., Harry A. Chernoff, Esq., Assistant United

States Attorneys, New York, NY, for the United States of America.

Law Offices of London & Robin, by Ira D. London, Esq., Meredith S. Heller, Esq., New York, NY, for Defendant Stephen Michael Levy.

## OPINION

CHIN, District Judge.

In this case, a jury convicted defendant Stephen Michael Levy of producing and distributing child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252A(a)(1). The jury found that Levy sexually molested a five-year old girl, took photographs of himself doing so, and then transmitted the photographs—together with other videos of child pornography—across state lines over the internet.

Levy moves, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, for a judgment of acquittal or, alternatively, for a new trial with respect to Count One of the Indictment, which charged the production of child pornography. He does not move with respect to Count Two of the Indictment, the distribution count. Levy argues that the evidence at trial was insufficient as a matter of law to prove that he produced child pornography.

For the reasons discussed below, Levy's motion is denied. I also address certain issues that arose before and during trial.

## STATEMENT OF THE CASE

### A. The Facts

The evidence, viewed in the light most favorable to the Government, established the following:

### 1. Levy Goes To Virginia

On June 9, 2007, Levy rode his motorcycle from his home in Maryland to Stafford, Virginia, to visit a woman he had previously dated and her family. Levy arrived at the woman's home in the late afternoon. He eventually took her, her then-boyfriend, and her three children, including her five-year old daughter, to dinner at an Applebee's restaurant.[1]

After dinner, they returned to the Mother's home. Shortly after 9 p.m., they went for ice cream at a Baskin–Robbins, after which they returned to the Mother's home again.

At some point, Levy and the Boyfriend went out to purchase wine coolers, which they brought back to the house. At approximately 11 p.m., the three adults were watching television, using the internet, and socializing in the living room; the Mother and the Boyfriend were drinking the wine coolers. The Daughter fell asleep on a love seat in the living room, while the other two children went to sleep in their bedroom upstairs.

At approximately 11:30 p.m., the Mother decided to go to bed. She was tipsy from the wine coolers, and the Boyfriend helped her upstairs to her bedroom. They left Levy alone in the living room downstairs, with the sleeping Daughter. The Boyfriend returned to the living room, approximately fifteen minutes later.

While he was alone with the Daughter, Levy molested her. He pulled up her pajama top to expose her belly and pubic area, and then, with one hand, reached into her pajama bottoms and touched her genital area. He also took her hand and placed it onto his penis. He took three

---

1. At trial, the actual names were disclosed and used. In this opinion, in view of the privacy issues, I refer to the woman as the "Mother," her then-boyfriend as the "Boyfriend," and her five-year old daughter as the "Daughter."

photographs with his cell phone camera, two of the first pose and one of the second. As it turned out, two of the photographs (GXs 11, 13) were clear, showing Levy's hand reaching into the Daughter's pubic area, but the photograph of the second pose (GX 12) was extremely blurred. Its content cannot be discerned without resort to extrinsic evidence, *i.e.*, Levy's description of its subject matter.

Shortly after the Boyfriend returned to the living room, Levy left. It was approximately midnight.

### 2. *Levy Returns Home*

The distance from the Mother's home to Levy's home was approximately eighty miles. (GX 66). After Levy arrived home in Maryland, after 1 a.m., he logged onto his computer to chat with a friend whose screen name was "pretty2004jessica" ("Jessica"). The forensics analysis of Levy's computer shows that, on June 9, 2007, between 10:16 p.m. and 12:06 a.m., Jessica had sent forty-three instant messages to Levy, pleading with him to respond. (GXs 203, 204; *see* Tr. 427–30).[2] Levy did not respond until 1:22 a.m. on June 10th, when he wrote: "sorry, I was not home" and "i just got home." (GX 204).

Approximately an hour later, Levy emailed the three photographs in issue (GXs 11, 12, 13) from his cell phone to his America Online ("AOL") account at "Reallybad@aol.com." He opened the images and saved them onto his computer hard drive in a folder named "mine." The folder contained only the three photographs. Levy later emailed two of the photographs to another AOL user, "Hotforittoo." With respect to the blurry photograph (GX 12), Levy wrote: "can you make this out? ? ? I know what it is, and i couldnt." (GX 212).

### 3. *Levy Chats with "Elaine"*

On June 11, 2007, Levy entered an AOL "chat room" using his screen name "Reallybad@aol.com." Identifying himself as "Steve," he initiated a "chat" with a person who identified herself as "Elaine." In fact, "Elaine" was Michael Smith, an undercover New York Police Department detective in the Bronx posing as the divorced mother of two minor daughters, one 9 years old and the other "12 going on 21." (GX 2; *see* Tr. 46). Levy was interested in having sexual intercourse with "Elaine" and/or her daughters. (*See* GX 1R at 17–18).

As the chat unfolded, "Elaine" pretended to be skeptical, and asked Levy whether he was a member of law enforcement or working with broadcast media. (*Id.* at 4). To win her trust, Levy offered to tell her about his "real life experiences first." (GX 1R at 5). He wrote: "i eve[n] have REAL pics of me in the act ... just took them over the weekend ... from my cam phone." (*Id.*). He eventually described his visit to see the Mother the past weekend, identifying both the Mother and the Boyfriend by their first names. (*Id.* at 9). He described the visit, how he took the Mother, the Boyfriend, and the children to dinner, how they went back to their townhouse, and how he bought some wine coolers to get them drunk. (*Id.*). He described, in great detail, how, around 11:30 p.m., while the Mother and the Boyfriend were upstairs, he molested the sleeping Daughter, putting his hand inside her pajama bottoms, touching her inappropriately, and placing her hand on his penis. (*Id.*

---

**2.** As the Government's forensic analyst testified, the times listed in GXs 203 and 204 were not accurate, but instead were one hour earlier than the actual time. (*See* Tr. 426–428; GXs 202, 203, 204). This testimony was not challenged by the defense. (*See* Tr. 441–44).

at 9–10). He stated, as the transcript of the chat shows:

> so i took 3 pics really fast..
>
> . . .
>
> 2 with my hand playing with her pussy..
>
> . . .
>
> and one with her hand around the head of my cock the one with the hand on me turned out blurry
>
> . . .
>
> I was sooooooooooo pissed

(*Id.* at 9–10). A few minutes later in the chat, Levy emailed two of the photographs to "Elaine," the blurry photograph as well as one of the two showing his hand reaching into the pubic area of the Daughter. (*Id.* at 10–11; *see* GXs 5, 6).

Levy continued to chat with "Elaine," having nine on-line chats with her over the course of three days. (GX 1R). Eventually, he showed "Elaine" his face on a webcam, and even held his driver's license up to the webcam so that "Elaine" could see that his name really was Stephen Levy. In fact, using a digital camera, Detective Smith photographed his computer screen repeatedly to capture images of Levy, Levy's driver's license, and certain of the images that Levy transmitted over the webcam. (GXs 101, 102, 117–22, 126). Levy boasted that "I have a lot of vids here on my computer and DVD's of videos." (GX 1R at 15). Levy played a video of child pornography—a young girl performing oral sex on a man's penis protruding through a teddy bear—on his computer with his webcam pointed at the screen so that "Elaine" could see it. Detective Smith was able to photograph some of the images on his computer screen. (GXs 117–200). During the chat, Levy also made a number of statements about himself, including that he had fondled and otherwise molested his niece when she was four years old (GX 1R at 6–7); that he had had a penis enlargement (*id.* at 56); and that he had a tattoo on his buttocks (*id.*).

### 4. *Levy Is Arrested*

On June 15, 2007, law enforcement agents arrested Levy at his home in Maryland. They also executed a search warrant, and seized his computer, removable media, cell phones, and hundreds of videos of graphic child pornography, many depicting sexual activity with children who appeared younger than six years old. Among them was the "teddy bear" video that Levy had played for "Elaine" over his webcam.

After waiving his *Miranda* rights, Levy spoke to the agents and wrote out and signed a statement. (GXs 81, 82). He admitted that he had been trading child pornography for years, but stated that he started only after his son had been molested by someone, and he began to do his "own personal investigation" into "these types of people." (GX 82). He stated that he had never produced any "pics" or videos himself, and that he had never touched or intended to harm any child. He admitted that he had emailed the three photographs in question to "Elaine," but maintained that he had acquired them on his computer from an "online source."

### 5. *The Mother Is Interviewed*

Two months after Levy was arrested, after the Government was able to identify the Mother, a detective from the Stafford County Sheriff's Office interviewed her at her home. (Tr. 318–19). He showed her the three photographs and asked her if she recognized any clothing in the photos. (*Id.* 319–21, 333). In response, she retrieved a pink pajama top and gave it to the detective. (*Id.* 322; GX 80). The pink pajama top was received into evidence at trial, and the coloring is consistent with the pajama

bottoms in the two photographs in which the pajama bottoms can be seen. (GXs 11, 13, 80).

## B. *Prior Proceedings*

### 1. *The Indictment*

Levy was indicted on July 24, 2007. Count One charged Levy with producing child pornography, in violation of 18 U.S.C. § 2251(a), based on his taking of the three photographs of the Daughter on his cell phone and transmitting them in interstate commerce. Count Two charged Levy with distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(1), based on the transmission to "Elaine" in the Bronx of the three cell phone photographs as well as the video that Levy played during their chat.

### 2. *The In Limine Motions*

On October 6, 2008, the Government moved *in limine* for the admission of the transcript of the chats between Levy and "Elaine" and images and videos from Levy's collection of child pornography. The evidence was proffered both as direct evidence of the charged crimes as well as background evidence to show Levy's motive and intent. The Government sought to offer the entire transcript, including portions relating to the events of June 9, 2007 as well as portions relating to Levy's alleged prior sexual abuse of children. The images and video included both the images and video that were the subject of Counts One and Two as well as others. Levy objected, on hearsay and Rule 403 grounds.

At a conference on October 16, 2008, we had some preliminary discussions about the Government's motion, but I did not hear argument on the motion until October 23, 2008.

The Government withdrew the prong of its motion seeking to admit evidence of the discussion of an alleged incident involving a fourteen-year old girl at a nudist camp. (10/23/08 Tr. 2). I granted the balance of the Government's motion. I ruled that the Government could offer the portion of the transcript in which Levy described molesting his niece eighteen years earlier, when she was four years old. (*Id.* 10–11). I overruled Levy's objections to the rest of the transcript as well, including a portion where he held up to his webcam a pair of underwear he claimed belonged to a neighborhood child, as well as portions where Levy discussed his child pornography collection. I also overruled his objections to receipt of the images and video from his collection. (*Id.* 11–12; *see id.* 3–4, 4–8).

### 3. *The Trial*

Trial commenced with jury selection on November 3, 2008 and opening statements and the Government's first witnesses on November 5, 2008. The Government rested on November 10, 2008.

Because of scheduling issues, I permitted Levy to call his first witness before I heard argument on his motion for a judgment of acquittal. (Tr. 567–68; *see id.* 556–58). Levy's first witness was a doctor who had examined Levy a few days earlier. The doctor testified that Levy had not had a "penile prosthesis," or penis enlargement, and that Levy did not have a tattoo on his buttocks. (*Id.* 570–71).

After the doctor testified, Levy's counsel argued his motion for a judgment of acquittal. (*Id.* 572). I immediately denied the motion as to Count Two, but raised several questions as to Count One, including the following issues. First, I was concerned whether the blurry photograph could be a sufficient basis for a conviction. Among other things, I questioned whether a reasonable jury could determine that the

photograph—because it was so blurred—met the definition of child pornography. (*Id.* 572–73). The Government argued that the blurry photograph was sufficient to support a guilty verdict. (*Id.* 577–78). Second, I noted that the statute uses the words "a minor engaging in sexually explicit conduct," 18 U.S.C. § 2256(8)(A), and I posed the question whether a sleeping child could be "engaging in" sexually explicit conduct. (Tr. 573). I initially reserved decision as to Count One, but then denied the motion as to Count One as well. I noted, however, that I still had concerns as to the sufficiency of the blurry photograph as a basis for conviction. (*Id.* 579, 586).[3]

Levy continued with his defense case, taking the stand in his own defense. He testified that he had been molested as a child by a family friend. (*Id.* 591). He testified further that his son had been molested, and that his son's experience caused him to begin researching child molesters. (*Id.* 592–94). In time, he maintained, he began to confront child molesters he met online. (*Id.* 599–600). He admitted that, in the course of engaging in this activity, he traded and collected child pornography. As for the evening of June 9, 2007, he admitted that he had visited the Mother and her family and taken them out to dinner, but he denied molesting the Daughter. He testified that he left Virginia at approximately 10 p.m. and arrived home at approximately 11:15. (*Id.* 611). He acknowledged that he had the three photographs on his cell phone, but provided an explanation. He claimed that he began chatting with another AOL user shortly before 11:30 p.m., who sent him the three images in question. He opened the images on his computer, and photographed each one with his cell phone, he testified, because he wanted to have a date and time stamp on the images. (*Id.* 666).

After completing his testimony, Levy called his niece, who testified that she had never been molested or otherwise inappropriately treated by her uncle. Levy also called his son, who confirmed that he had been sexually molested as a child.

The Government presented a brief rebuttal case, which included playing a portion of a recording of a telephone call between Levy in prison and his brother, during which Levy coached his brother to testify that Levy had been molested as a child and had told no one other than him. (Tr. 715–18).

At the conclusion of the evidence, Levy renewed his motion for a judgment of acquittal. I denied the motion, except that I reserved decision as to the blurry photograph. (Tr. 735). I determined to give the jury a question on the verdict form asking it, in the event of a guilty finding on Count One, to indicate which of the three photographs formed the basis for its verdict. The case was submitted to the jury on November 12, 2008.

The jury returned its verdict the next day, November 13, 2008, finding Levy guilty on both counts. (*Id.* 838–39). As to Count One, the jury stated that its verdict was based on all three photographs. (*Id.* 839).

That evening, by letter dated November 13, 2008, the Government withdrew its argument that the blurry photograph was a sufficient basis for a conviction. In other words, the Government acknowledged that the jury's guilty verdict as to Count One could only be sustained based on the other two photographs.

---

**3.** On November 11, 2008, the Government submitted a letter addressing the issues I had raised. It continued to argue that the blurry photograph was sufficient to support a guilty verdict on Count One.

On November 26, 2008, Levy filed the instant motion.

## DISCUSSION

I first discuss Levy's motion for a judgment of acquittal or, alternatively, a new trial. I then address three issues that arose before or during trial: (1) the Government's *in limine* motion for the admission of certain evidence; (2) the sufficiency of the blurry photograph as a basis for conviction; and (3) whether a "sleeping child" can be found to be "engaging in" sexually explicit conduct. I address the three issues now, because they are important issues that warrant a fuller discussion. When I previously considered the issues, I did so from the bench, and there are few reported decisions on these subjects in this Circuit.

### A. Levy's Motion

#### 1. Applicable Standards

##### a. Rule 29

■ A defendant moving for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure based on the sufficiency of the evidence "faces a heavy burden." *United States v. Glenn,* 312 F.3d 58, 63 (2d Cir.2002) (internal quotations omitted). The court must uphold a jury's verdict of guilty if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, the court concludes that " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Medina,* 944 F.2d 60, 66 (2d Cir.1991) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Therefore, a jury's verdict will be affirmed "so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States*

*v. Hamilton,* 334 F.3d 170, 179 (2d Cir. 2003).

A conviction, however, cannot be based on "speculation and surmise alone." *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir.1994). Thus, the Government "must do more than introduce evidence 'at least as consistent with innocence as with guilt.' " *Id.* (quoting *United States v. Mulheren,* 938 F.2d 364, 372 (2d Cir. 1991)).

##### b. Rule 33

■ Pursuant to Rule 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). A new trial is to be granted only "in the most extraordinary circumstances." *United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993). The defendant bears the burden of proving that this extraordinary remedy should be granted. *See United States v. Sasso,* 59 F.3d 341, 350 (2d Cir.1995).

■ Nonetheless, a trial court has "broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *See United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir.2001) (quoting *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir. 1992)). In deciding whether to grant a motion for a new trial, "the judge is not required to view the evidence in the light most favorable to the prosecution." *United States v. Coriaty,* No. 99 Cr. 1251, 2001 WL 1910843, at *2 (S.D.N.Y. July 16, 2001). In addition, "the court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Robinson,* 430 F.3d 537, 543 (2d Cir.2005) (internal citations and quotations omitted). At the same time, "the court may not wholly usurp the jury's role. It is only where exceptional circumstances can be demon-

strated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* (internal citations and quotations omitted).

■ The overriding concern on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *Ferguson,* 246 F.3d at 134. Generally, a court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." *Id.*

### 2. *Application*

■ Both prongs of Levy's motion are denied, for the Government presented convincing and compelling evidence that Levy sexually molested the Daughter on June 9, 2007, took cell phone photographs of himself doing so, and later transmitted the images across state lines. The jury certainly could have fairly concluded, based on the evidence presented at trial, that Levy was guilty of producing child pornography. Moreover, letting the jury's verdict stand would not result in manifest injustice.

Levy argues that the evidence presented against him was insufficient as a matter of law to sustain the conviction on Count One. He contends that the record contains "no evidence outside [his] own false or boastful statements in a chat room conversation that the images were of a live child." (Def. Mem. at 3). He argues that both he and "Elaine" were role-playing and telling lies, and notes, for example, that he lied about having a penis implant and a tattoo on his buttocks. He argues that, indeed, his niece's testimony showed that he was lying when he boasted to "Elaine" that he had molested his niece.

Levy also relies on testimony of one of the Government's expert witnesses to the effect that the expert could not differentiate between images taken by Levy's cell phone of an actual object and images taken of an object shown on a computer screen. (Tr. 382–83). In addition, he notes that the pink pajama top received into evidence at trial was not corroborating evidence because the Mother could not state with any certainty that there was anything distinctive about the pajama bottoms in the photographs. (*Id.* 563–65). Finally, he notes that the Mother expressed some doubt as to whether Levy actually molested her Daughter. (*Id.* 565).

Levy's arguments are rejected, for the following reasons:

First, the Government presented far more than Levy's "own false or boastful statements in a chat room" to prove that on June 9, 2007, at approximately 11:30 p.m., he took three photographs of the Daughter herself in Stafford, Virginia. The Government presented substantial evidence to disprove Levy's assertions that he was at home in Maryland that evening at approximately 11:30 and that he took three photographs not of a real girl but of images on his computer screen. The Government's evidence included, *inter alia,* the following:

- Both the Mother and the Boyfriend testified that Levy was still in the Mother's home in Stafford, Virginia, at approximately midnight.

- Levy's banking records, which were received at trial, showed that he made purchases at Applebee's, 7–Eleven, and Dunkin' Donuts (which included a Baskin–Robbins) in Stafford, Virginia, that evening. (GXs 301, 301.1, 304, 500–S; Tr. 479, 609).

- Levy's telephone records (and a cell tower analysis) show that he was in Stafford, Virginia, that evening, and that he received a cell phone call while in the vicinity of Stafford at 9:19 p.m. (GXs 62–63). This was the telephone call that the Mother and Boyfriend

testified Levy received while they were at the Baskin–Robbins. (Tr. 498–503, 526–31). Given that Levy and the others thereafter then returned to the Mother's home, where they stayed for some time watching television and socializing, Levy could not have made the eighty-mile drive and been home in Maryland by 11:15 p.m., as he testified. (Tr. 611).

• The forensics analysis of Levy's computer showed that Jessica tried repeatedly to reach him on his home computer via instant message between 10:16 p.m. and 12:06 a.m. that evening, and he did not respond. (GXs 203, 204; *see also* GX 215 at 25; Tr. 421–22).

• The same analysis shows that, finally, at 1:22 a.m., he responded to Jessica, writing: "sorry i was not home" and "i just got home." (GX 204).

• The computer forensics analysis also shows that although "Reallybad@aol.com" was logged into AOL continuously from one computer from 9:10 a.m. on June 9, 2007 until 11:33 a.m. on June 10, 2007, the activity on the computer from 10 p.m. on June 9th until midnight was inconsistent with someone actually using the computer. (Tr. 417–18, 422, 443–44).

• Levy saved the three photographs in a file on his computer labeled "mine," which contained no other photographs; given the hundreds of images elsewhere on his computer, a reasonable jury could find from these facts that Levy was saving the images as "mine" because he made them himself. (Tr. 433–37).

• On June 10, 2007, Levy sent two of the images to "Hotforittoo," including the blurry photograph. (GXs 211, 212). On the subject line of the email transmitting the blurry photograph, Levy

wrote: "can you make this out? ? ? i know what it is and i couldnt." (GX 212). A reasonable jury could find from these facts that Levy knew what was in the blurry photograph because he took the photograph himself.

• When the Stafford County detective showed the Mother the photographs, she produced a pink child's pajama top, the coloring of which is consistent with the pajama bottom that appears in the photographs. (GX 80; Tr. 322).

Second, as to Levy's argument that his statements were "false or boastful" and that both he and "Elaine" were lying and role-playing, the jury was entitled to conclude that some of Levy's statements in the chat room were truthful, even though some were false. The jury was free to evaluate the statements, and to accept some of them even while finding that others were false. *See, e.g., United States v. Gleason,* 616 F.2d 2, 15 (2d Cir.1979) (jury may find witnesses "to be truthful, in whole or in part"). In fact, Levy's statements in the chat about the events of June 9, 2007, were corroborated, in material respects, by other evidence in the case. Hence, the jury was free to accept Levy's admissions to Detective Smith—statements that constituted direct evidence of his guilt.

Third, Levy testified at trial and offered both a denial and an explanation. The jury obviously rejected this testimony. Based on its determination that Levy was lying, the jury was free to conclude that Levy was lying because he was conscious of his guilt. The jury could also have found, based on the evidence at trial, that Levy had made false exculpatory statements as well when he was arrested, further evidence of consciousness of guilt. *See, e.g., United States v. Gaviria,* 740 F.2d 174, 184 (2d Cir.1984) ("[F]alse exculpatory statements made to law enforce-

ment officials are circumstantial evidence of a consciousness of guilt and have independent probative force."). *See also United States v. Mundy*, 539 F.3d 154, 156–57 (2d Cir.2008); *United States v. Sattar*, 395 F.Supp.2d 79, 84 (S.D.N.Y. 2005) ("In considering the totality of the evidence, the jury is entitled to disbelieve a defendant's testimony and use its disbelief to supplement the other evidence against [the defendant], and may in light of all the evidence conclude that the defendant's testimony was false and thereby infer the defendant's guilt.") (internal quotations and citations omitted).

Fourth, the Government presented evidence that Levy had an extensive collection of child pornography, and that he had numerous files, a filing system, and screen names and other information for other collectors or traders of child pornography on his computer. As discussed below, the jury was entitled to infer from this evidence that Levy had the intent to produce child pornography.

Finally, Levy's remaining arguments are unavailing. That the Government's expert witness was unable, after conducting an experiment, to distinguish between images taken by Levy's cell phone of an actual object and of a computer screen image of the object does not undermine the other compelling evidence in the case. Likewise, the Mother's uncertainty as to Levy's guilt is irrelevant, as she was not present when Levy was left alone with her Daughter. Moreover, given all the circumstances of the case, including the fact that the Mother invited Levy into her home and introduced him to her children, it is not surprising that the Mother would not want to believe that Levy had molested her Daughter. Similarly, the Mother's testi-

mony that the pajamas lacked any distinguishing characteristic is of little significance, as it was up to the jury to decide whether the pajama top produced by the Mother in response to a detective's inquiry was similar to the pajama bottom in the photographs. The pajama top still could have been similar even without any distinguishing characteristics.

In sum, the jury's guilty verdict on Count One was amply supported by the evidence at trial. Accordingly, Levy's motion is denied.

## B. *The Additional Three Issues*

### 1. *The Evidentiary Issues*

In its *in limine* motion, the Government sought to introduce essentially the entire transcript of the various email chats between Levy and "Elaine," as well as photographs and videos of child pornography.[4] Levy opposed the motion on the grounds the transcript was hearsay and the probative value of the evidence was outweighed by its prejudicial effect. He argued that the probative value of his statements to "Elaine" was slight, because "lying is customary in these chat rooms," and "most, if not all, of the participants routinely exaggerate their statements and even completely falsify them." (10/16/08 Letter from London & Robin to Court, at 5). I rejected the arguments, ruling from the bench. (10/23/08 Tr. 10–12). I write now to more fully explain my reasoning.

#### a. *Applicable Law*

██ In general, "propensity" evidence—proof that a defendant engaged in similar conduct before and that, therefore, he is guilty of the charged act because it is likely he did it again—is inadmissible. *See*

---

4. During the course of the trial, additional, similar evidence was offered by the Govern-ment and received by the Court.

Fed.R.Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). An exception exists, however, for "child molestation" cases. Rule 414(a) of the Federal Rules of Evidence provides:

> In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

Fed.R.Evid. 414(a). An "offense of child molestation" includes, *inter alia,* the production of child pornography, 18 U.S.C. § 2251(a), as well as the possession, receipt, and distribution of child pornography. 18 U.S.C. § 2252A; *see* Fed.R.Evid. 414(d). Hence, in child molestation cases, evidence that a defendant engaged in child molestation in the past is admissible to prove that the defendant has a propensity to commit, or a disposition of character that makes it more likely that he did commit, the act of child molestation charged in the instant case. *See United States v. Castillo,* 140 F.3d 874, 879 (10th Cir.1998) (holding that in child molestation cases, Rule 414 replaces Rule 404(b) and allows prosecution to use evidence of defendant's prior acts to prove defendant had a disposition of character, or propensity, to commit child molestation); *see also Morris v. Eversley,* No. 00 Civ. 8166(DC), 2004 WL 856301, at *2 (S.D.N.Y. Apr. 20, 2004) ("Rules 413, 414, and 415 are based on the proposition 'that a defendant with a propensity to commit acts [of sexual assault and child molestation] similar to those charged is more likely to have committed the charged act than another and therefore such evidence is relevant.' ") (quoting

*Doe ex rel. Rudy–Glanzer v. Glanzer,* 232 F.3d 1258, 1268 (9th Cir.2000)).

■ Evidence that may be admissible under Rule 414 still must meet the other requirements of the Federal Rules of Evidence, including, for example, the hearsay rules and Rule 403. *See, e.g., United States v. Larson,* 112 F.3d 600, 604 (2d Cir.1997); *Morris v. Eversley,* 2004 WL 856301, at *2. Hence, the evidence will be admitted only if its probative value outweighs the danger of unfair prejudice. Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). But in sexual assault and child molestation cases, the presumption is that the probative value of the propensity evidence is not outweighed by the risk of unfair prejudice. *United States v. Larson,* 112 F.3d at 604; *United States v. Guardia,* 135 F.3d 1326, 1331 (10th Cir.1998); *see United States v. Mann,* 193 F.3d 1172, 1173 (10th Cir.1999) (courts are to "liberally admit evidence of prior uncharged sex offenses") (internal quotations omitted).

### b. *Application*

Levy's objections to the Government's evidence was properly overruled.

■ First, Levy's hearsay objection was not well-founded, for his statements in the transcript were not hearsay, but were statements offered by the Government against Levy as admissions of a party-opponent. Fed.R.Evid. 801(d)(2) (statements of party-opponent offered against him are not hearsay). The Government offered the statements as admissions by Levy that he had engaged in the conduct

in question.[5]

■ Second, certain of the statements and certain of the photographs and videos were admissible not as propensity evidence but as direct evidence of the charged crimes. Levy's admissions relating to the events of June 9, 2007 were direct evidence that he committed the act of producing child pornography. Certain of his statements relating to the transmission of the photographs and videos were direct evidence that he had engaged in both production and distribution of child pornography. Other statements, while not direct proof of the charged crimes, were admissible because they were "inextricably intertwined with the evidence regarding the charged offense," and was "necessary to complete the story of the crime on trial." *United States v. Carboni,* 204 F.3d 39, 44 (2d Cir.2000) (internal quotations omitted).

■ Third, certain of the evidence was admissible as propensity evidence pursuant to Rule 414. Levy was charged in this case with two acts of "child molestation," and the Government was entitled to offer evidence of prior acts of child molestation "on any matter to which [they were] relevant." Fed.R.Evid. 414(a). Evidence that Levy had engaged in prior sexual conduct with children and had previously possessed child pornography was relevant to show his sexual interest in children and his propensity or disposition of character to engage in sexual acts involving children.

It is true, as Levy argues, that much of this evidence was highly prejudicial. Many of the videos, for example, were immensely disturbing, as they showed young girls—some only six years old or even younger—being subjected to horrendous acts. But the evidence was not *unfairly* prejudicial, as this was conduct that Levy chose to engage in, and this was evidence that showed, convincingly, that Levy had a sexual interest in children and the intent and desire to commit the charged crimes.[6] Indeed, this case demonstrates that Rule 414 makes sense, for it shows that the reasoning behind allowing propensity evidence in child molestation cases is sound. That Levy chose to have a large collection of child pornography, including disturbing videos of young girls being sexually molested, that he seemingly took pride in collecting and trading child pornography, that he kept a filing system and maintained contact information on other traders and collectors, and that he seemed to have a particular desire to have "REAL pics of [himself] in the act," all tended to prove that it was more probable that he committed the act charged in Count One.[7]

---

5. Detective Smith's statements in the transcript were not hearsay because they were not offered to prove the truth of the matter asserted; rather, they were offered to provide the background and context for Levy's statements. *See* Fed.R.Evid. 801(c).

6. *See also United States v. Sebolt,* 460 F.3d 910, 917 (7th Cir.2006) (evidence that defendant had history of child molestation was "highly prejudicial," but it was not *"unfairly* prejudicial"); *Costantino v. Herzog,* 203 F.3d 164, 174 (2d Cir.2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair."*). As the Advisory Committee's Notes on Rule 403 explain,

" 'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis commonly, though not necessarily, an emotional one."

7. *See* Fed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *see also United States v. Brand,* 467 F.3d 179, 197 (2d Cir. 2006) (noting "direct connection" between child pornography and pedophilia, affirming conviction where trial court allowed evidence of defendant's child pornography collection to prove his sexual interest in children); *United*

Finally, Levy's contention that he was merely lying in the chat, that Detective Smith was lying in the chat, and that people often lie and exaggerate in internet chats was beside the point. As discussed above, it was the jury's prerogative to accept some of the statements even while rejecting others, and many of Levy's statements in the chat were corroborated by other evidence in the case.

Accordingly, the Government's *in limine* motion was properly granted.

### 2. *The Blurry Photograph*

During the course of the trial, I raised the issue of whether the blurry photograph could be a proper basis for a conviction. Although Levy had described the photograph as showing the Daughter's hand on his penis, objectively speaking the photograph was so blurry that an observer could not determine what it was, much less that it was a "visual depiction" of "a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(A). By his counsel's letter dated November 12, 2008, Levy argued that the blurry photograph should not be considered by the jury as a basis for guilt on either count. The Government argued, by letter dated November 11, 2008, that the blurry photograph was a sufficient basis for a conviction because the key was how an image was made, not what it looked like, and because a defendant violated section 2251 by using a child in a particular way, without regard to the quality of the final image. The Government thus argued that Levy violated section 2251 merely by taking a photograph of his penis with the Daughter's hand on it, regardless of whether a discernable photograph was produced.

After the jury returned its verdict, indicating that its verdict of guilty on Count One was based on all three photographs, including the blurry one, the Government changed its position, withdrawing its argument that the blurry photograph could support a conviction on Count One.

I hold that, in the circumstances of this case, where an indictment charges a defendant with actually producing child pornography and transporting it in interstate commerce, a conviction cannot be sustained based on a photograph that is so blurry no reasonable jury could conclude that it was a visual depiction of "sexually explicit conduct." Accordingly, here, the jury's verdict with respect to Count One is vacated, but only to the extent it was based on the blurry photograph.

> Section 2251(a) provides that:
>
> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct for the purpose of producing any visual depiction of such conduct [commits the crime of producing child pornography], if such person knows or has reason to know that such visual depiction will be transported ... in or affecting interstate or foreign commerce or mailed, ... or if such visual depiction has actually been transported ... in or affecting interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a). The statute defines "sexually explicit conduct" to mean, *inter alia,* "actual or simulated ... sexual intercourse ... [or] masturbation ... [or] lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(i), (iii), (v). "Visual de-

---

States v. Cunningham, 103 F.3d 553, 556 (7th Cir.1996) ("Most people do not have a taste for sexually molesting children. As between two suspected molesters, then, only one of whom has a history of such molestation, the history establishes a motive that enables the two suspects to be distinguished.").

piction" includes "undeveloped film and videotape, [and] data stored on computer disk or by electronic means which is capable of conversion into a visual image." *Id.* § 2256(5). "Child pornography" means any "visual depiction . . ., whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct . . . or . . . such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." *Id.* § 2256(8)(A), (C).

As the statute requires a "visual depiction" of a "minor engag[ing] in . . . any sexually explicit conduct," it would seem, as the Government now acknowledges, that the content of the depiction is legally significant. If the jury cannot determine what is being depicted in a photograph, the jury is unable to determine whether "sexually explicit conduct" is being depicted.

It may be in some cases, as the Government initially argued, that a defendant violates section 2251(a) by attempting to create child pornography even when he fails to produce a discernable "visual depiction." *See, e.g., United States v. Buculei,* 262 F.3d 322, 327 (4th Cir.2001) (affirming conviction for producing child pornography even where video camera failed to capture sexually explicit conduct with minor, where defendant was charged with producing child pornography knowing that "such visual depiction *would be* transported" in interstate commerce) (emphasis added); *see also United States v. Sirois,* 87 F.3d 34, 39 (2d Cir.1996) ("the statute requires *either* that the pornography cross state lines *or* that the defendant know or have reason to know that pornography will do so") (emphasis in original). Here, however, the indictment charged only that "such visual depiction

has actually been transported in interstate commerce," and thus the Government was required to prove that a "visual depiction" of a minor engaging in "sexually explicit conduct" was "actually" transported in interstate commerce. *See Sirois,* 87 F.3d at 38 ("a violation of § 2251(a) that is based on the *actual* transportation of child pornography across state lines *cannot* be complete until the pornography is so transported") (emphasis in original); *see also United States v. Milstein,* 401 F.3d 53, 65 (2d Cir.2005) ("When the trial evidence or the jury charge operates to 'broaden [ ] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended. Constructive amendment is a *per se* violation of the Fifth Amendment.") (internal citations omitted). Because the jury could not reasonably conclude that the blurry photograph was such a "visual depiction," the jury's verdict is vacated to the extent it was based on the blurry photograph.

### 3. *A Sleeping Child*

■■■ Finally, during the course of the trial, I noted that the statute referred to the use of "any minor to engage in . . . any sexually explicit conduct," 18 U.S.C. § 2251(a), and I raised the question of whether a child can "engage in" sexually explicit conduct when she is asleep and unaware of what is happening to her. I concluded that the statute covered the use of a "sleeping child," and proposed to instruct the jury that "[e]ven a sleeping child can 'engage in' sexually explicit conduct when, for example, another person uses the child to create the sexually explicit conduct." (Tr. 802). Levy objected to this language (*see* 11/12/08 Letter from London & Robin to Court, at 2), but I overruled the objection.

The objection was properly overruled, for the statute, both as a matter of language and logic, clearly encompasses the sexual exploitation of a sleeping child.

First, the language of the statute supports the conclusion that a sleeping child is protected. Although the use of the words "to engage in" does imply, at first glance, that the minor is affirmatively engaging in conduct—or taking action—of a sexually explicit nature, the definition of "child pornography" explicitly includes a "visual depiction" that has been created to make it *appear* that an identifiable minor is engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(C) (emphasis added). Hence, even if the child is sleeping, if the child is used or manipulated in such a manner as to make it *appear* that she is engaging in sexually explicit conduct, then the statute is violated. Accordingly, the language of the statute explicitly covers the facts of this case, where the two photographs show a man's hand reaching into the pubic area of a child, conduct that would surely fall within the prong of the definition of "sexually explicit conduct" that covers the "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v).[8] In fact, a viewer would not even know that the child in the photograph was asleep.

Second, as a matter of logic, section 2251(a) surely covers a sleeping child. Indeed, children are legally incapable of consenting to sex with an adult, and thus it would make no sense to construe the statute as applying only to children who "knowingly" engage in sexually explicit conduct. As a matter both of common sense and public policy, the statute must be construed to protect all children, including those who are unaware of what they are doing or what they are being subjected to, whether because they are sleeping or under the influence of drugs or alcohol or simply because of their age.[9] As the Government argues, to some a young child or

8. I charged the jury to consider what are known as the *Dost* factors in making its determination as to whether the photographs were "lascivious." (Tr. 803). *See United States v. Rivera*, 546 F.3d 245, 249–50 (2d Cir.2008) (discussing *United States v. Dost*, 636 F.Supp. 828 (S.D.Cal.1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir.), and *aff'd*, 813 F.2d 1231 (9th Cir.1987)).

9. *See, e.g., Rivera*, 546 F.3d at 251 ("Of course an innocent child can be coaxed to assume poses or expressions that bespeak sexual availability when viewed by certain adults, resulting in an image that 'suggests sexual coyness or a willingness to engage in sexual activity' regardless of the child's own characteristics."); *United States v. Vowell*, 516 F.3d 503, 507 (6th Cir.2008) (conviction affirmed, where victim was minor child "drugged or asleep"); *United States v. Thomas*, 92 Fed. Appx. 960 (4th Cir.2004) (affirming conviction under 18 U.S.C. § 2251(a), where defendant videotaped sleeping nine-year old girl, filming her panties and exposed genital area); *United States v. Wolf*, 890 F.2d 241, 242–43, 247 (10th Cir.1989) (holding that section 2251's proscription of "lascivious exhibition" was properly applied to photograph of partially nude, sleeping five-year old girl); *United States v. Gordon*, No. 03–00412–02–CR, 2004 WL 253496 (W.D.Mo. Feb. 9, 2004) (accepting plea to violation of 18 U.S.C. § 2251(c)(1)(A), based on photographs of "unclothed female baby, with apparent focus on her genital area," and holding that "innocent passivity is a form of engaging in conduct," and accepting theory that "the passive baby in question was engaging in conduct that some may consider to be sexually explicit"). *See also United States v. Arvin*, 900 F.2d 1385, 1391 (9th Cir.1990) ("In order to be lascivious, the exhibition must be pornographic, even if it need not be obscene. At the same time, it must be recognized that the type of sexuality encountered in pictures of children is different from that encountered in pictures of adults. This is because children are not necessarily mature enough to project sexuality consciously. Where children are photographed, the sexuality of the depictions often is imposed upon them by the attitude of the viewer or photographer.").

an unconscious victim may be "more attractive prey"; these individuals should not be immune from prosecution under the statute. (11/11/08 Gov't Letter to Court, at 7).

Finally, given the language of the statute, a clarifying instruction was appropriate to make it clear to the jury that even a sleeping child could "engage in" sexually explicit conduct for purposes of the statute. The instruction I gave correctly stated the law, and it eliminated the possibility of confusion.

## CONCLUSION

For the foregoing reasons, Levy's motion for a judgment of acquittal or, alternatively, a new trial is denied. The jury's verdict is set aside only to the extent that, with respect to Count One, it was based on the blurry photograph. Because the other two photographs are sufficient to support the verdict as to Count One, the conviction will stand.

SO ORDERED.